## C. S. PATTERSON ET AL. v. CHARLES LENNIG.

APPEAL FROM THE COURT OF COMMON PLEAS NO. 4 OF PHILADELPHIA COUNTY.

Argued January 12, 1888—Decided February 13, 1888.

1. As a well established rule to remain unimpaired, a trustee will not be allowed to purchase the trust property at his own sale unless by leave of the court first had, nor in any manner to make a profit out of the same.

2. Yet, where the stock of an insolvent corporation, is placed by the owners in the hands of a stockholder, himself a creditor, " to be used for the liquidation of the company's indebtedness," the surplus to be returned to the contributors, and, four years after paying the other creditors out of the stock, the trustee paid his own claim with that which remained, without fraud and at a fair valuation, and the transfer to himself appeared upon the company's books; on a bill for an account filed by the contributing stockholders: *Held*, that the plaintiffs were without equity, were estopped by their acquiescence, and that the rule stated above was inapplicable.

Before Paxson, Sterrett, Green, Clark and Williams, JJ.; Gordon, C. J., and Trunkey, J., absent.

No. 58 July Term 1887, Sup. Ct.; court below, No. 465 March Term 1884, C. P. No. 4 in equity.

The proceeding in the court below was by a bill in equity filed on May 9, 1884, by Cunningham S. Patterson, Richard Penistan and Henry R. Heyl against Charles Lennig. Soon after the filing of the bill, there was an amendment by way of striking out the name of Henry R. Heyl as a party complainant. At a subsequent date other parties were added as complainants.

The bill averred: That in the year 1875 the plaintiffs, together with a number of other persons, were stockholders in The American Paper Box Machine Co.; that the said company being in financial difficulty, the plaintiffs with the other stockholders, entered into an agreement to contribute each a proportionate number of his shares to a trust fund of one thousand shares, to be placed in the hands of a trustee to be used for the liquidation of the company's present indebtedness, and any surplus remaining after the said debt was removed to be returned pro rata to the persons so contributing the same; that the plaintiffs and many other stockholders did, in accordance with this agreement, contribute their respective proportion of shares to this trust fund, which fund was placed in the hands of the defendant, Charles Lennig, as trustee of the fund; that the said Lennig had proceeded to execute the trust, and paid some of the debts of the corporation with the trust stock; that meanwhile the old corporation was reorganized under the name of The Novelty Paper Box Co., and the shares in question were transformed into shares of The Novelty Paper Box Co.; that since January, 1875, the defendant had held 984 shares of the said stock in trust, had paid certain debts out of the trust fund of stock, and had collected dividends, but although requested to do so had never given the complainants any account of his trusteeship; that the plaintiffs were desirous to pay in money whatever sums might be still payable out of the trust stock in the hands of the defendant, and to withdraw the stock from his control; that so far as they were informed the only money still due out of the trust fund of stock was owing to the defendant himself, who was claiming to hold the trust stock as his own private property, free of all trusts.

The prayers of the bill were that the defendant be ordered to make a full account of his trusteeship; to surrender such shares held in trust, as might by the account when taken be found to belong to the plaintiffs, on such terms as may seem just and equitable; and further relief.

The answer admitted that the defendant received certain shares of stock substantially as alleged in the bill, but denied that the defendant acted as trustee for the holders thereof excepting for the payment of debts of the corporation; that only

837, not 984, shares were received; that the plaintiffs contributed a less number of shares than was alleged in their bill; denied that no account had been rendered when requested, and finally set up as a defence that all the stock not paid out to other creditors of the corporation had been transferred to the defendant in payment of his claim at a higher figure than had ever been paid for the stock, and after offering the stock freely without finding any purchasers; that full authority was given to the defendant to sell the stock to himself; that he was chosen to hold the stock because he was the largest creditor, and that the transfer or sale by which he took the stock in payment of his claim was made openly in 1879, without deception, and with the full knowledge and consent of all the parties in interest.

The cause being put at issue, *Mr. Matthew Dittmann* was appointed examiner and master, who made a report on December 16, 1886, finding the following facts:

In January, 1875, The American Paper Box Machine Co. was insolvent, owing from $27,000 to $34,000, most of which was due to its own stockholders; about $19,000 being due to Charles Lennig, the defendant, who was at that time president of the company.

On January 16, 1875, in order to rescue the corporation from its embarrassments, a meeting of the stockholders was held, at which it was agreed that each stockholder should surrender one half of his stock "for the following purposes, viz.: 1500 shares of the same so contributed are to be placed in the company's hands to be used to provide working capital, and 1000 shares to be placed in the hands of a trustee to be used for the liquidation of the company's present indebtedness, and any surplus of the latter remaining after the said debt is removed to be returned pro rata to the persons so contributing the same. This agreement is not obligatory unless 2450 shares are so subscribed and contributed."

The agreement was put in writing as quoted above and was signed by the plaintiffs and the defendant, who each and all contributed the amount of stock called for by the agreement with one exception. Mr. Lennig was chosen trustee, and received the stock contributed, registering it on the books of the

company in his name as trustee, except the 177 shares which were due from himself; these he did not formally transfer from his individual name, but always considered them as forming part of the trust fund.

The chief creditors to be paid out of the fund were:

1. Mr. Charles Lennig, the defendant, about        $19,000
2. Mr. Heyl, a stockholder,        .    .    .    .    4,600
3. Mr. Simpson, a stockholder,          .    .    .    2,085
4. Mr. Patterson, stockholder, a disputed claim,      7,550

The defendant's account of the matter is: "To the best of my recollection, Mr. Patterson, very absurdly as I thought, wished me, or rather insisted and advocated, that the creditors should take that stock at $50 per share, when the company was offering to sell the stock at $40 per share, and I therefore declined the proposition."

Again in letter of May 13, 1875, the defendant wrote to Mr. Patterson, one of the plaintiffs: "At a meeting of the stockholders, Mr. Heyl suggested that each of the company's creditors take sufficient of this stock at $25 [evidently a slip of the pen for $50] per share and thus close that item; to this for my part I objected, but in lieu proposed that a trustee be appointed to hold the stock for a reasonable time to see if the development of the business would bring up its value when the same could probably be placed to better advantage, as I had no desire to advantage myself at cost of any of the contributors, while desirous of holding all the security possible; as, in case of the eventual liquidation of the company, if any assets were left, of course the share falling to this trust stock would go to the creditors in so far as not in excess of their claims, and it is in this point where your assumption fails entirely; as to the creditors agreeing to take stock at par for their claim such was never for one moment entertained nor proposed."

The evidence of the plaintiffs was to a like effect, differing somewhat in unessential details.

Soon after this agreement was made and the stock placed in Mr. Lennig's hands, Mr. Heyl was paid his debt by the transfer to him out of the trust fund of 100 shares of stock.

Mr. Patterson undertook to pay himself his disputed claim of $7,550, in stock at par, 151 shares. He owed to the trust

fund, as his pro rata contribution, 264 shares, but he only paid 113 shares, claiming the right to retain the remaining 151 shares on account of his claim. There was a hot dispute between himself and the trustee on this point, the trustee demanding his full quota in letters of May 13, 19, and June 11, 1875. In these letters he criticises the action of the board of directors which had recognized the claim as valid against the company, and ordered it to be paid out of the trust fund of stock. But according to the answer, and his testimony, the trustee finally conceded the point at the request of some of the contributors, much against his own judgment.

At a later date, in September, 1875, Mr. Simpson was paid his debt by the transfer of sixty-three shares out of the trust fund. This payment was made by the defendant to Mr. Simpson with the knowledge and permission of the contributors at $33 per share. Mr. Lennig says he has no recollection of reporting this payment to a meeting of the contributors to the trust fund, but that he may have done so. Mr. Heyl says positively that the trustee was authorized to pay Simpson in stock at $33 per share at a meeting of the contributors on September 23, 1875, held in Mr. Patterson's office on Third street. A memorandum was also in evidence to a like effect.

Thus after September, 1875, there was but one creditor left who had a claim to be paid out of the trust fund of stock in the trustee's hands, and that creditor was the trustee himself, Mr. Lennig. How it happened that he paid or allowed to be paid all the other debts as already detailed, but did not pay his own of $19,000, which was the largest of all, does not appear entirely clear from the testimony. This much is certain, he was not willing to accept the stock at $50 per share for his debt, which would have given him at once about 380 shares of the trust fund and would have left to be returned to the contributors something like 194 shares in the trustee's hands. But, having refused to pay himself in this way, for some reason known to himself, he preferred to leave his own debt unpaid and to keep in his hands as trustee the 574 shares out of which he was entitled to pay it. His explanation of this part of the transaction is, to quote his own language: "I thought it was due (to certain persons) that I stated, if within a reasonable period, by the success of the company, the stock

would attain a higher value (the shares placed in my hands) than they would owe me, with interest accumulating, that I would be willing to return any excess pro rata to them."

These transactions took place in 1875, and in October, 1879, the trustee, without any notice to the contributors of the trust fund, transferred all the 574 shares remaining in the trust fund into his individual name and canceled his claim of $19,000, which by this time had increased with interest to $24,539.11. In his own words : " On October 29, 1879, I credited the company with my claim, by assuming or transferring to myself 574 shares of that stock for the sum of $24,539.11, being equal to $42.71 per share." He had previously offered the trust stock for sale privately at prices lower than he himself took it for his own debt, but found no purchasers. There had been sales of stock of the company at low prices varying from $2.75 per share to $25, during the years 1877–81. No dividends were paid on the stock from January 16, 1875, until June 14, 1880. On that day $5 per share was paid on account of a reduction of capital stock, and a stock dividend of 15⅓ per cent. was made. Since then dividends have been regularly paid every six months, varying in amount from $1.25 to $3 per share, and on June 2, 1883, $15 per share was paid, in further reduction of the capital stock.

On February 8, 1875, The American Paper Box Machine Company changed its name to that of The Novelty Paper Box Company.

The plaintiffs were never at any time notified by the trustee, Mr. Lennig, of the transfer of the trust stock to himself in 1879. Nor was there any evidence in the case to show that they had any knowledge of it, with the exception of Heyl and Patterson, before this suit was brought. Heyl and Patterson learned of it by chance from third persons, it did not appear exactly when.

A receipt was also in evidence signed by Heyl, one of the plaintiffs, for thirty-one shares of stock in full satisfaction of all money claims or right of any sort whatever against Charles Lennig. This was dated May 24, 1881. It was given by him in conjunction with one William Lyndall, assignee, in the course of settlement of some loans made during five or six years by Mr. Lennig to Heyl on certain shares of stock as col-

lateral, the thirty-one shares being the residue of the collateral left in Mr. Lennig's hands after payment of the loans. This receipt was the final settlement of the whole transaction. On April 29, 1884, plaintiffs' counsel, by letter of that date, demanded an account of the trustee defendant, and almost immediately thereafter filed the bill in this cause.

Upon the foregoing facts, the master held that Mr. Lennig, the defendant, received from the plaintiffs the several hundred shares of stock of the company in trust to pay the debts of the company, his own among the rest, and to return the balance of the stock if any to the plaintiffs; that having soon afterwards paid all the debts except the debt due to himself of about $19,000, the transfer to himself on October 29, 1879, of the balance at $42.71 per share, in payment of his debt, now amounting with interest to $24,599.11, was in legal terms a purchase by the trustee at private sale of the trust stock; that to state such a transaction was to condemn it: 1 Wh. & T. L. C. in Eq., 239; Grim's App., 105 Pa. 375; that the defendant was not, as a trustee to pay debts, with authority to pay his own debt among the rest, as was claimed under the authority of Campbell v. Penn. Life Ins. Co., 2 Wh. 53, which was to be distinguished, as in that case there was a public judicial sale, an acknowledged exception to the rule. He further held that there was no estoppel of the plaintiffs by acquiescence; that the burden was upon the defendant by distinct and explicit evidence to bring home to the plaintiffs the knowledge of the facts on which the alleged acquiescence was founded: Hill, Trustees, 169*; that there was no evidence to show that the trustee had been misled to his injury by the failure of the plaintiffs to act more promptly, which distinguished the case from Watts's App., 78 Pa. 370, and Ashhurst's App., 60 Pa. 290. The report then concluded:

I hold, therefore, that this transfer or sale of trust stock by the trustee to himself, in 1879, was inoperative and void to divest the interest of the cestuis que trustent, the plaintiffs therein, because transgressive of the rule that a trustee cannot on any terms purchase the trust property; and further, I hold that there was no authority expressly given or implied for the trustee to pay his own debt in this secret way without notify-

ing the cestuis que trustent; and lastly, that the plaintiffs never had, so far as appeared in the evidence, any knowledge whatever of the transactions upon which to base an acquiescence, except in the case of Heyl and Patterson (and in their case the information was too vague and imperfect), which would estop them from now avoiding the transaction. It follows, therefore, that the prayer of the bill should be granted, and the defendant be ordered to make an account to the plaintiffs of his trusteeship.

The master recommended a decree, in accordance with his report, that the defendant forthwith account before the master to the plaintiffs for all the stock of The Novelty Paper Box Company or of The American Paper Box Machine Company, received by him from the plaintiffs, in trust to pay the debts of the said The American Paper Box Machine Company, and that the costs of the cause be paid by the defendant.

With the master's report, certain exceptions by the defendant, overruled by the master, were also filed, which exceptions, on April 27, 1887, were disposed of by the court, THAYER, P. J., delivering the opinion:

In January, 1875, The American Paper Box Company was insolvent. To rescue the company from its embarrassments a meeting of the stockholders was held, at which it was agreed that each stockholder should surrender one half of his stock " for the following purposes, viz.: Fifteen hundred shares so contributed are to be placed in the company's hands, to be resold, to provide working capital for future business, and one thousand shares to be placed in the hands of a trustee, to be used for the liquidation of the company's present indebtedness; any surplus of these one thousand shares remaining after the said debts are removed shall be returned pro rata to the persons contributing the same." This meeting was held January 16, 1875.

The object which the stockholders had in view was to raise money to carry on the company's operations by the sale of the fifteen hundred shares. It was not supposed that this could be accomplished unless they were able to announce that the company was out of debt. To pay the debts they therefore agreed to appropriate the additional one thousand shares. The de-

fendant, Mr. Lennig, who was the president of the company and the largest creditor, was appointed the trustee to pay the debts with the one thousand shares surrendered for that purpose. There were but four creditors, and they were all stockholders, viz.: Mr. Lennig, to whom they owed $19,000; Mr. Heyl, to whom they owed $4,600; Mr. Simpson, to whom they owed $2,085, and Mr. Patterson, who had a disputed claim against the company for $7,550.

Of the one thousand shares agreed to be contributed to pay off the debts, in point of fact only seven hundred and eighty-three shares were contributed and passed into the hands of Mr. Lennig. Of these he contributed one hundred and seventy-seven himself. Four days after this, viz.: January 20, 1875, the company offered for sale twelve hundred and fifty of the fifteen hundred shares contributed for that purpose, at forty dollars a share, announcing that " the stockholders guaranteed that the said company is free from debts of every kind." They perfectly well understood that they could not get new subscribers to come into the company until it was relieved of its debts. The stock placed in Mr. Lennig's hands " to be used for the liquidation of the company's indebtedness " appears to have been applied by him to that purpose in pursuance of the expressed object for which he received it. Mr. Heyl, of his own motion, agreed to cancel the debt due to himself in consideration of the receipt of one hundred shares. Mr. Simpson accepted sixty-three shares in discharge of the indebtedness of the company to him, being at the rate of thirty-three dollars per share. Mr. Patterson undertook to pay himself by retaining, against the trustee's wishes, one hundred and fifty-one shares out of the two hundred and sixty-four which he had bound himself to contribute.

The only creditor remaining unpaid was Mr. Lennig, the trustee. The stock had no marketable value at the time it was deposited in his hands for the payment of the debts. It could not be sold at any price. Two years later it was sold for two dollars and seventy-five cents a share, par being fifty dollars. Four years later, namely, in April, 1879, it was sold for seven dollars per share. On November 10, 1879, Patterson, the complainant, sold one hundred and eighty-eight shares at fifteen dollars and ninety-six cents per share. As late as 1881, Pat-

terson sold four hundred and thirty-two shares at twenty-five dollars per share. Between 1875 and 1881 the price ranged from two dollars and seventy-five cents to twenty-five dollars a share. Mr. Lennig held the stock for more than four years without paying with it the debt which was justly due to himself. During that period it was repeatedly offered to the directors by Mr. Lennig at from thirty to thirty-three dollars per share, but could find no takers. He frequently offered it to other persons but could find no buyers.

On October 29, 1879, all the other creditors having been long since paid, Mr. Lennig, to close the matter up, transferred the residue of the stock, five hundred and seventy-four shares, to himself in payment of his debt, which then amounted, with the accumulated interest, to $24,539.11, which was at the rate of forty-two dollars and seventy-one cents per share. He had paid the other creditors with stock by virtue of the authority which he had to do so, and he now paid himself in the same manner. The master says, " for some reason known to himself he preferred to leave his own debt unpaid and keep in his hands as trustee the five hundred and seventy-four shares out of which he was entitled to pay it." The reason why Mr. Lennig waited so long before paying his own debt with the stock which he held for that purpose, is quite apparent from the evidence. He waited to see if within a reasonable period, by the success of the company, the stock might not attain a higher value and become worth more than the amount of his debt, his declared intention being in that event to return any surplus which might remain to the contributors. It was to carry out in good faith this purpose that Mr. Lennig continued to hold the stock as trustee, hoping that the business of the company would so improve as to cause a rise in the stock, which, when he received it, had no marketable value whatever.

This course, so far from being a proper subject of animadversion, was highly commendable, and was plainly for the benefit of the contributors, for it gave them the chance of a rise in the stock and a possibility of getting some of it back, if it had so happened that the value should rise to a point which would more than pay the large indebtedness of the company to the defendant. After waiting more than four years for this purpose, he paid his debt of $24,539.11, in October,

1879, with the stock which remained in his hands, and which was thus applied to the purpose for which it was given, at a valuation of $42.71 per share. That this was more than the stock was worth, clearly appears from the testimony of William C. Stevenson, who has been a stockholder, director and manager of the company from February, 1875, to the present time. He was the business manager of the company for ten years.

On November 10, 1879, Mr. Stevenson bought of Patterson, one of the complainants, one hundred and eighty-eight shares for fifteen dollars and ninety-six cents per share. About the same time he purchased from other stockholders other lots at about the same figure. In 1880 he bought it at twenty-five dollars per share. On March 24, 1881, he bought four hundred and thirty-two shares of Patterson, the chief complainant in this case, at twenty-five dollars per share. This was seventeen months after Mr. Lennig had taken the stock at forty-two dollars and seventy-one cents per share. The stock had no market value, and sales could only be effected at private sale.

These facts show conclusively that Mr. Lennig, in paying his debt, acted with entire good faith in carrying out the trust which he had undertaken, and that he allowed the contributors a much larger price for the stock than they could have obtained from any one else. No one made any complaint until four years and a half had elapsed after the matter had been settled and closed. In 1884, the stock having improved in value, the complainants filed this bill. The litigation they then commenced was plainly the result of an afterthought resulting from the subsequent improved prospects of the company.

The master seems to have thought that Mr. Lennig should have taken the stock at fifty dollars per share, but upon what principle he could fairly be expected to do so when it was being offered by the company in the market at forty dollars, and could only be sold at prices ranging from seven dollars to twenty-five dollars, we cannot understand. He also seems to have thought that he should have paid his debt at an earlier day, and not have continued to hold as trustee the five hundred and seventy-four shares " out of which he was entitled to pay it; " but it must be manifest from what has been already

observed, that the delay of Mr. Lennig in settling his own large debt against the company was altogether in the interest of those who had contributed the stock, and was in point of fact greatly beneficial to them and to the company.

The master, however, rests his decision upon the principle that a trustee cannot be permitted to purchase the trust property. We entirely agree with him that this is a well-established proposition, and that it is altogether " superfluous to cite authorities for so well-recognized a principle," but it appears to us that the master erred in assuming that this principle has any proper application to this case. Of course if a trustee makes any profit out of a trust estate that profit belongs to the cestui que trust and not to him. But this is not that case. In this case the trustee did exactly what he was employed to do. He was trustee for the payment of debts with the stock transferred. The discretion confided to him was to settle the debts with the stock transferred in the best way and upon the best terms he could. He had no other function to perform than this. He carried into effect the very purpose for which he was constituted a trustee, and the only question is whether he acted in good faith and took no unfair advantage of those who had intrusted the property to him.

Now it cannot certainly be successfully contended that a trustee cannot be employed to pay debts out of a fund intrusted to him for that purpose, or that he cannot be expressly authorized to pay a debt due to himself as well as debts due to other persons. There is no rule in law or equity that a trustee shall in no case take a benefit under a deed of trust when such benefit is expressly conferred upon him by that deed. He may even buy from his cestui que trust, provided there is a distinct and clear contract, ascertained to be such after a jealous and scrupulous examination of all the circumstances, and that there was a clear intention that the trustee should buy, and it is apparent that there was no fraud or concealment, nor any unfair advantage taken: Coles v. Trecothick, 9 Ves. 247, and the cases cited in Hill on Trustees, 159, note c. The present case is not, however, the case of a trustee buying from his cestui que trust, but it is the case of a trustee carrying out the trust, and effecting the very object contemplated and enunciated in the express terms of the trust and in the very man-

ner intended. Mr. Lennig was employed as a trustee to pay off the debts of the company with the shares of stock transferred to him. He was to pay all the debts with the stock, his own debt as well as the debts of the other three creditors. His own debt was much larger than those of the other three creditors combined. It was perfectly well understood and agreed that he should pay his own debt as well as the others. He had no other office or duty except to liquidate the claims of the four creditors, of whom he was himself the largest, with the stock transferred to him. He was appointed an agent to pay off the debts with the stock contributed. He was the largest creditor and the largest contributor. He had the same right to pay himself which he had to pay the others, and the same authority. He was bound to do that upon fair and equitable terms, and to take no advantage of the contributors in doing so. He was to pay all. It was for that purpose and that purpose alone that he was appointed. It was not stipulated, nor was it contemplated, that in the discharge of this duty he should consult the contributors. His powers and duties were in no degree dependent upon their action or advice, and the evidence shows that it was never intended or contemplated that they should be. If his power to act had been dependent upon the will of the contributors he would have been a mere naked trustee to hold the title, which is not pretended, and which is disproved by the evidence.

He was the president of the company, one of the largest stockholders, the largest creditor, and the largest contributor to the stock set apart for the payment of the debts. They were willing to trust to his honor, his judgment and his discretion in the discharge of the duty confided to him. They asked for no security and they imposed no conditions. The evidence shows to our entire satisfaction that he discharged the duty imposed upon him with entire good faith, with perfect fairness, and with a scrupulous regard for the interests of all concerned. He waited for four years before paying his own debt in order that the contributors might profit by the delay.

It must be remembered that it was not contemplated that the stock should be sold at public sale, for it was well known that it was absolutely impossible to dispose of it in that man-

ner. There was no public market for it whatever. It was "to be used for the liquidation of the company's indebtedness," used according to the trustee's best discretion. It was intended that the stock should be applied to the payment of the debts by settlements made with the only four creditors which the company had, and it was contemplated that Mr. Lennig should pay his own debt, as he did the others, by applying to its liquidation specifically, at a fair and reasonable price, so much of the stock contributed as might be necessary for that purpose.

If he had the right to pay the other creditors in stock, as is conceded, he had the right to pay himself in the same manner. In applying the 574 shares which were left in his hands after the other creditors had been paid to the payment of the debt of $24,539.11 due to himself, he took no advantage whatever of the contributors. The price at which he took it in 1879 was, it is clear from the evidence, at least $26 per share more than at that time could be obtained for it from any other person, and $17 per share more than the plaintiff himself, Patterson, sold it for, seventeen months later, in 1881.

After the most careful examination of all the evidence taken in the cause it is perfectly clear to us that the defendant took no unfair advantage whatever of the plaintiffs or the other contributors, but that he acted from the begining to the end in the utmost good faith towards them, and with a scrupulous regard for their rights as well as for his own honor and duty as a trustee.

If the defendant had not fully and satisfactorily accounted for the disposition of the stock intrusted to him, the plaintiffs would of course be entitled to an account. But he has accounted in this proceeding so fully, and established by the evidence so clearly, the fact that he has disposed of all the stock intrusted to him in a perfectly fair and legitimate manner in pursuance of the terms of the trust, that no further account is necessary.

He had a right under the terms of the trust, to pay his own debt as well as the others. In doing so he did not abuse the confidence reposed in him. He took no advantage of the plaintiffs. He acted with perfect fairness to the complainants and all concerned. They have no just ground of complaint against him whatever. An attentive examination of all the evidence

has produced in our minds a clear and settled conviction that the plaintiff's case is entirely destitute of equity.

The exceptions to the master's report are therefore sustained, and it is now ordered and decreed that the bill be dismissed and that the plaintiffs pay the costs.

Thereupon the plaintiffs took this appeal from the said decree, assigning that the court erred:

1. In holding that the principle that a trustee cannot be permitted to purchase the trust property had no application.

2. In holding that it was fair and faithful conduct in the trustee to refuse openly in 1875 to take the trust stock at $50 per share for his debt, and then to take it secretly at $42.71 per share.

3. In holding that the trustee took no advantage of his cestuis que trustent, and had fully accounted.

4. In refusing to affirm the master's report, and in dismissing the plaintiff's bill.

*Mr. Theophilus B. Stork* and *Mr. John G. Johnson,* for the appellants:

1. Had the trustee authority to sell the stock to himself? There is no case cited, nor is there any known to us, either in Pennsylvania or in England, which decides that a trustee to pay debts is not within the rule that a trustee cannot sell the trust property to himself on any terms. The reason and life of the rule is, that no man shall be both judge and party, and no man shall be suffered to buy at a sale controlled by himself: 1 Wh. & T. Lead. C. in Eq., 4th ed., 176, 215; Chronister v. Bushey, 7 W. & S. 152; Beeson v. Beeson, 9 Pa. 279; Chorpenning's App., 32 Pa. 316; Campbell v. McLain, 51 Pa. 200; Downes v. Glazebrook, 3 Mer. 200; Aultman's App., 98 Pa. 517. He therefore had no authority by implication of law. A review of the testimony [here made] shows no express authority in fact.

2. Did the master sell the stock to himself at a fair price? In other words, was this a fair transaction, such as a court of equity would sustain and ratify? The master found as a fact that it was unfair. Moreover, why should the trustee sell to himself, or pay himself, on better terms than all the other creditors received?

3. Did the plaintiffs by their delay and acquiescence lose their right to question the transfer of this stock to himself by the trustee? The burden was on the defendant to show that the plaintiffs had the fullest information about the sale. Not a single contributor to the trust fund was notified. To displace a title to relief by delay or acquiescence, it lies on the defendant by distinct and explicit evidence to bring home to the plaintiff knowledge of the facts: Hill, Trustees, 169*; Story, Eq. J., § 322 a; Hill, Trustees, 525*.

*Mr. Richard C. McMurtrie* and *Mr. J. Edward Carpenter*, for the appellee:

1. The rule invoked by the plaintiffs in the bill was never intended for such cases as this, where plainly the object was to rid the company of the debts, and stock, absolutely worthless, was handed to the creditors for that purpose. The court is not required to disturb the rule or to draw nice distinctions. It is solid, business-like ground to say, that when there were four years acquiescence and the trustee if warned of the objection could have avoided the technicality by selling under an order of court, relief will not be given in equity: Grim's App., 105 Pa. 375; Campbell v. Penn. Life Ins. Co., 2 Wh. 53.

2. In the first instance, the general presumption is in favor of the discharge of the trust, especially where there may be two constructions to an act; and, therefore, a cestui que trust complainant must make out his case affirmatively: McGinn v. Shaeffer, 7 W. 412; MacCubbin v. Cromwell, 2 Har. & G. 443; Smith v. Clay, 3 Bro. C. C. 39, n. 1. When a party desires to rescind on the ground of fraud or mistake, he must announce his intention at once upon the discovery of the facts, and adhere to it; he is estopped by acquiescence: Bisp. Eq., 3d ed., § 259 et seq.; Morawetz, Corp., § 409; Watts's App., 78 Pa. 370; 1 Wh. & T. Lead. C. in Eq., 4th ed., 148; Ashhurst's App., 60 Pa. 290; Beeson v. Beeson, 9 Pa. 280; Perry, Trusts, § 870.

3. In determining questions of good faith, knowledge is regarded as equivalent to notice of the highest degree: 2 Wh. & T. Lead. C. in Eq., 4th Amer. ed., 148. Actual notice, proved in the case of one complainant is sufficient: Wade, Notice § 11; Calvert, Parties in Equity, 17 Law. Lib. 46, citing Make-

peace v. Hawthorne, 4 Russ. 247; Spain v. Machards, 4 Russ. 241; Hunter v. Richardson, 6 Mad. 89; Morawetz, Corp., 409.

OPINION, MR. JUSTICE PAXSON.

This case has been so well discussed by the learned judge of the court below that we might well be excused from adding to what he has said. In order that the case may not be misunderstood or misapplied hereafter, we desire to repeat emphatically that we do not propose to interfere with or impair in the least degree the well established rule that a trustee will not be allowed, unless by leave of court first had, to purchase the trust property at his own sale, nor in any manner to make a profit out of the same. This rule is not only established, but it is one of great value, and essential to the proper administration of trust estates. But we are of opinion with the learned judge below that the rule in question does not apply to the facts of this case. As a general rule a trustee who purchases the trust property at his own sale does so in violation of his trust; whereas the appellee in this case, in the application of the stock in question to the payment of the four creditors of the company, including himself, was acting in the direct execution of his trust. He was doing with the stock just what it was given to him for. There is therefore no room for even an allegation of a breach of trust. The only question, therefore, is whether the stock was so applied in good faith, and at a fair price. Upon this point there is no room for a serious dispute.

There were but three creditors to pay besides himself. His own claim exceeded the aggregate of the others as his contribution of stock greatly exceeded theirs. It is true the stock was not sold at public sale. It was merely transferred in extinguishment of the respective claims. That this mode of its application was the mode, and the only mode ever contemplated by the parties to the trust, is self-evident. The stock had no market value; it could not have been sold at any time at any price that would have paid the debts. Had the appellee paid his own claim at the time he paid the others, I presume no dispute about it would ever have arisen. He delayed for some years, and then took it at $42.71 per share. This was greatly above any price that could have been obtained for it at any sale, public or private. After the appellee had taken

the stock at $42.71 per share, Mr. Patterson, one of the complainants, on November 10, 1879, sold 188 shares at $15.96 per share. On March 24, 1881, he sold 432 shares at $25.00 per share. This was seventeen months after the appellee had taken the stock at $42.71 per share.

Much stress was laid upon the delay of the appellee in appropriating the stock to the payment of his debt. Upon this point the learned judge below found the facts as follows: "The reason why Mr. Lennig waited so long before paying his own debt with the stock which he held for that purpose, is quite apparent from the evidence. He waited to see if within a reasonable period, by the success of the company the stock might not attain a higher value and become worth more than the amount of his debt, his declared intention being in that event to return any surplus which might remain to the contributors. It was to carry out in good faith this purpose that Mr. Lennig continued to hold the stock as trustee, hoping that the business of the company would so improve as to cause a rise in the stock, which, when he received it, had no marketable value whatever." This finding of the court is not contradictory of any finding by the master, and, if it were, is based upon sufficient evidence. It leaves nothing whatever to sustain the appellants' charge of bad faith.

It was also urged that the appellee did not report to the company the transfer of this stock in payment of his own debt. We do not attach much importance to this point. Some of the appellants had knowledge if not notice of the transaction, and as the transfer appeared upon the books of their own company to which they had access, they might have known it, had they cared to inquire. This is a question of good faith, and in such cases knowledge is regarded as equivalent to notice of the highest degree: 2 Leading Cases in Equity, 4th Amer. ed., 148. "When a party having knowledge of such facts as would lead any honest man using ordinary caution to make further inquiries, does not make, but on the contrary studiously avoids making such inquiries, he must be taken to have notice of those facts, which, if he had used ordinary diligence, he would readily have ascertained:" Wade on Notice, § 11, and cases there cited.

The aquiescence of the appellants for four years is certainly

against them. They had no right to suppose that Mr. Lennig would settle his own claim in any different manner than he settled with the other creditors, and if they had given him notice of any objection he could have sold the stock under an order of court. It is true it would not have brought half the money at which he took it, but it would have left no room for subsequent complaint.

The complainants are in a court of equity and there is no equity in what they ask. The principle which they invoke was never intended for such a case, and to apply it here would work the very reverse of equity.

The decree is affirmed and the appeal dismissed at the costs of the appellants.