Burke Appeal.

Argued April 12, 1954. Before STERN, C. J., STEARNE, JONES, BELL, CHIDSEY, MUSMANNO and ARNOLD, JJ.

618

*John W. Bour,* with him *Matthew D. Mackie,* for appellant.

*James G. Colleran,* with him *Edward A. Reilly* and *Charles Nealon Bourke,* for appellees.

OPINION BY MR. JUSTICE CHIDSEY, September 27, 1954:

This is an appeal from the final decree of the Court of Common Pleas of Lackawanna County dismissing exceptions to the restated account[1] of Earl V. McLaughlin and William A. Bissell, substituted trustees, under an agreement dated September 19, 1940, executed by and between Walter R. Burke, E. V. McLaughlin and Lee P. Stark.

In 1934 the appellant, Walter R. Burke, was the principal owner of an extensive tract of land in Jefferson Township, Lackawanna County, Pennsylvania, known generally as Moosic Lake. Out of the entire property which consisted of about 3,000 acres, the appellant owned approximately 2,200 acres of land, a small 20 acre lake, one-half of a 90 acre lake (Moosic Lake), an undivided half interest in the other half of Moosic Lake and an undivided half interest in a tract

---

[1] Exceptions having been filed to a final account, it was agreed between counsel that the final account be withdrawn and a restated account be filed in lieu thereof.

of 800 acres. The other one-half interest in Moosic
Lake and in the 800 acres was owned by Charles Rob-
ertson, Florence Robertson and Anna Robertson.

The First National Bank of Scranton, Pennsylva-
nia held a mortgage of $25,000 against appellant's in-
terest in the property. In 1938 the bank demanded pay-
ment but appellant was unable to meet the terms of the
mortgage. Threatened by foreclosure proceedings, ap-
pellant sought the assistance of Earl V. McLaughlin,
an attorney, who had previously performed legal serv-
ices for the appellant. McLaughlin, with the consent of
the appellant, enlisted the aid of Lee P. Stark, also an
attorney, and together they contrived a plan designed
to rescue appellant from his financial predicament.
After discussions and negotiations between the attor-
neys and the bank, it was agreed that the appellant
would be granted a two year extension in which to pay
the mortgage. To accomplish this the appellant on
September 8, 1938 conveyed to the bank his interest in
the Moosic Lake property and other improved real es-
tate owned by him in the Borough of Dunmore, Penn-
sylvania. The bank, in turn, agreed to sell the proper-
ties back to appellant for $25,400; $10,400 to be paid
at the end of one year and $15,000 to be paid at the
end of two years. Contemporaneously Stark advanced
$2,250 to finance the transaction. Under an agreement,
dated September 5, 1938, appellant quitclaimed his
interest in the properties to Stark and McLaughlin,
and assigned to them the contract with the bank to re-
purchase. In consideration thereof McLaughlin and
Stark agreed to manage and control the property and
sell lots therefrom in order to pay off the mortgage,
attorneys' fees of $10,000 and the sum advanced by
Stark at the time of the extension agreement.

During the two year period from September 5, 1938
to September, 1940, the attorneys created a real estate

development at Moosic Lake, laid out lots, interested realtors and builders and sold some of the property. Stark continued to advance considerable sums of money to the enterprise throughout this period. However, at the end of two years the contract to repurchase was in default, neither appellant individually nor the Moosic Lake project having produced sufficient funds to repurchase the property. By this time the attorneys were owed $12,646.96 by reason of advancements, plus their fee of $10,000, or a total of $22,646.96.

In contemplation of the anticipated default Stark and McLaughlin negotiated a new agreement and presented it to appellant for his consideration. Before entering into this second agreement appellant consulted independent counsel, Joseph F. Gunster, Esquire, for advice as to its meaning and effect. This agreement, which was not executed until September 19, 1940, ten days after the default, provided, inter alia, that: ". . . 1. Stark agrees to advance sufficient moneys to secure from The First National Bank of Scranton, Pa., an agreement for the sale of said property and hereditaments, it being understood that Stark will be obligated to the Bank for the amount due said Bank by Burke in September, 1938, as subsequently reduced. 2. Stark shall attempt to sell the property and/or hereditaments, or any part thereof, for such prices, and upon such terms as he deems proper until termination of this agreement. The proceeds of all sales shall be used to obtain a fee simple legal title, free of encumbrances, liens and taxes in the said Stark in all property and hereditaments then unsold, pay all moneys due, or to become due, as a result of advances made, or to be made, pay all counsel fees, as agreed upon, and all expenses of maintenance, operation, advertising and selling. 3. When the proceeds of all sales are sufficient to cover the expenses of obtaining the aforementioned re-,

sult, and in no event otherwise, Stark agrees to hold the property remaining unsold for the following purposes: Stark shall, at his option, retain title of the property as a trustee for himself, McLaughlin and Burke for the purpose of liquidating the same and dividing the net proceeds of such liquidation equally between himself, Burke and McLaughin, or his, or their assigns, or may transfer the property to such other persons or corporation as he may elect to hold the property as trustee in the same manner, that is, liquidate the same and divide the net proceeds between the said Stark, McLaughlin and Burke, or their assigns, or may transfer the property to a corporation that shall be formed for the sole purpose of taking title to said property and liquidating the same. In such case the stock in control of such corporation to be divided equally between Burke, McLaughlin and Stark or their assigns. . .".

Under this last agreement Stark proceeded to develop the property with McLaughlin as the active manager. On March 2, 1942 Stark died and by order of court, dated March 30, 1942, McLaughlin and William A. Bissell, Stark's law partner, were appointed substituted trustees in lieu of Lee P. Stark.[2] By virtue of the order the substituted trustees succeeded to all the rights and duties undertaken by Stark under the agreements of 1938 and 1940. Pursuant to the powers conferred the substituted trustees, with McLaughlin as

---

[2] On January 12, 1950, after the present appeal was taken, Bissell died. On July 1, 1953, McLaughlin died. No attempt was made to appoint a substituted trustee because at the time of the filing of the account all the assets of the trust had been conveyed to the Moosic Lakes Corporation, as hereinafter set forth. On March 29, 1954 the appellant filed in this Court a suggestion that Helen B. Bissell, Bissell's executrix, and Margaret M. McLaughlin, administratrix of the Estate of Earl V. McLaughlin, be substituted as appellees for the deceased trustees.

the entrepreneur and active manager, continued development of the Moosic Lake area and proceeded by various business devices to promote the sale of lots and encourage the building of homes with the objective of transforming the area into an auspicious summer resort colony.

During the course of McLaughlin's management he created a nonprofit corporation known as the Moosic Lakes Club to enhance the value of the land being offered for sale and to make it highly attractive to residents and prospective purchasers. To this club there was conveyed all of the area covered by the lakes; the Robertsons at McLaughlin's solicitation having conveyed their undivided one-half interest in the larger lake to the trusteeship. There was also conveyed to the club by the trustees a strip of land running entirely around both lakes, all of the roads and certain other areas within the general plot, designated as "Commons". The primary objective in forming the club was to transfer to it the obligation of paying the expenses of operating the lakes, maintaining the roads and other facilities and to provide for the residents a series of protected recreational areas, including the lakes themselves. The development was divided into lots and lot owners became members of the club, paying annual dues which toward the termination of the trusteeship amounted annually to about $8,000. The money to organize and help finance this club was advanced by the trustees from development funds.

McLaughlin also consummated an ingenious arrangement with the owners of the remaining half interest in the 800 acre plot. The trustees were given the right to act as sales agents for the Robertsons' half interest in the land and retain the balance of the gross sales after paying the expenses incident thereto and a small percentage of the price obtained to the owners.

The final account of the substituted trustees as restated covered the period from the inception of the trust to March 31, 1947. On March 5, 1947 the substituted trustees, acting under provisions of the second agreement, formed a corporation of the second class, known as Moosic Lakes, Inc. On March 29, 1947, by a deed the substituted trustees conveyed to the corporation all of the undisposed real estate with the exception of certain groups of lots which the trustees on that date had conveyed to Stark's widow, Bissell and McLaughlin. They also assigned to the corporation all accounts receivable due the trust and all personal property which they had acquired as part of the corpus of the estate under their management. Stock in the corporation was divided equally between Burke, McLaughlin and the Stark interest.

The conveyances to Stark's widow, Bissell and McLaughlin were for the purpose of liquidating balances shown by the account to be due to the Stark Estate and McLaughlin. When the appellant filed exceptions to these particular transactions appearing in the restated account on the ground of inadequacy of price, the grantees reconveyed these lots to the trustees subsequent to the filing of the restated account and they in turn conveyed them to the Moosic Lakes Corporation. Therefore, at the time of the hearing the Stark Estate and McLaughlin claims remained outstanding.[3]

Several years prior to the filing of the account, Mrs. Stark, Bissell and McLaughlin had bought cer-

---

[3] Subsequently McLaughlin and Bissell respectively purchased two lots from the corporation, each crediting $5,000 (which represented the fair market value) against the respective balances due McLaughlin and the Stark Estate. These credits would ultimately be taken into account by the corporation which as the successor to the trustees became obligated to satisfy these outstanding claims in liquidating the trust.

tain lots in the development for their own use or occupancy, charging themselves the stated prices for lots in the particular area by crediting their value as payments on account of the indebtedness due Stark and McLaughlin. Appellant contends that the trustees were guilty of self dealing in thus conveying parcels of the land to themselves, to Mrs. Stark, widow of the original trustee, and as well to Donald Reifsnyder, a law partner of one of the trustees, and therefore should be surcharged the value of the land conveyed. This is based upon the well established rule that a trustee is not permitted to purchase trust property. Under this rule it is completely immaterial that the trustee acted in good faith or paid a fair consideration for the property because it is a rule of public policy which applies in all cases, whether there be fraud or not: *Continental Bank & Trust Company of New York et al. v. American Assembling Machine Company, Inc.*, 350 Pa. 300, 308, 38 A. 2d 220; see also Restatement, Trusts, §170, Comment b. This principle, however, has no application to the facts of this case. There can be no doubt that by the terms of the trust a trustee may be permitted to do what in the absence of such a provision in the trust instrument would be a violation of his duty of loyalty: See 2 Scott, Trusts, §170.9; 54 Am. Jur., Trusts, §453. Cf. *Spring v. Hawkes*, 351 Pa. 602, 41 A. 2d 538.

When resort is had to the language of the trust agreement, it becomes apparent that the trustees were authorized and directed to sell the trust property for certain particular purposes, one of these being that the trustees' claims should be satisfied out of the trust estate. This intention is manifested in the second paragraph of the agreement wherein it is provided that: ". . . The proceeds of all sales shall be used to obtain a fee simple legal title, free of encumbrances, liens and taxes in the said Stark in all property and heredita-

ments then unsold, *pay all moneys due, or to become due, as a result of advances made, or to be made, pay all counsel fees as agreed upon,* and all expenses of maintenance, operation, advertising and selling.". (Emphasis supplied). When the trustees made these particular conveyances and credited their value against the indebtedness due them, they were acting in accordance with the intention of the appellant and directly executing the trust: Cf. *C. S. Patterson et al v. Charles Lennig,* 118 Pa. 571, 587, 12 A. 679. The result is in no way altered because the particular medium of payment differed from that mentioned where the price credited fully reflects the true value of the land conveyed, for both the proceeds and the land itself comprise the trust res. The trustees accomplished directly what unquestionably could have been done by receipt of the purchase price of the lots and immediate payment of the claims in cash. Moreover, we are of the opinion that by his acquiescence generally in the manner of accomplishment of the purposes of the trust as hereinafter appears, the appellant was precluded from questioning what otherwise might be challenged as a breach of trust.

The only inquiry then with respect to this contention is whether in liquidating these claims against the corpus the trustees exercised good faith and paid fair consideration for the conveyances. The auditing judge found that these lots were charged against McLaughlin's and Stark's accounts at the current prices for lots in their location at the time of the transfers. A real estate expert, Bart J. Lynch, who was connected with the development from the beginning, testified that trustee Stark directed him to appraise the lot which he planned to deed to McLaughlin and that he valued it at $2,000 which he considered a very fair appraisal because of the conditions prevailing at that time. The appellant at-

tempted to show by McLaughlin's testimony that the price was inadequate because he subsequently realized $2,000 on the sale of approximately 75% of the lot. Any inference of unfairness that might have arisen from this testimony was explained away by evidence that McLaughlin purchased the land in January, 1942, one of the formative years of the project, and resold it five or six years later when all land at the development had greatly appreciated in value due to the numerous improvements at Moosic Lake. There was also adequate evidence to support the lower court's finding that the conveyances to Mrs. Stark, Bissell and Reifsnyder were for fair consideration and conformed to prices of lots of a similar nature.

Rather than unduly lengthen this opinion with an extended discussion of this testimony, it suffices to say that appellant had ample opportunity to introduce contradictory testimony as to the value of the properties in question but did not see fit to do so. Since the exceptant had alleged a breach of trust by the trustees, the burden of persuasion was on him to prove the particulars of any wrongful conduct: *Brown's Estate,* 343 Pa. 19, 29, 21 A. 2d 898; *Bard's Estate,* 339 Pa. 433, 437, 13 A. 2d 711.

Appellant next contends that since it was the duty of the trustees to sell the property, they had no right to delegate this duty to a realtor and charge real estate commissions of $13,232.15 to the trust. The trust instrument lends itself to a construction that the appellant, under the broad powers given the trustees, authorized them to employ assistants in executing the trust. It provides that the proceeds of all sales shall be used, inter alia, to pay all expenses of maintenance, operation, advertising and *selling.* However, even apart from such construction, a trustee charged with a duty to sell land can properly employ a broker or other agent

to secure offers, and if a sale is effected as a result of the production of a purchaser by the broker, the trustee can pay him compensation out of the trust estate: 2 Scott, Trusts, §171.2, p. 914. This power is conferred on the trustee because it is regarded as necessary and appropriate for carrying out the purposes of the trust: See Restatement, Trusts, §186, Comment d. It would border on the absurd to expect the trustees personally to negotiate and consummate every sale of a lot where the development consists of some 3,000 acres of land, divided into 12,000 lots, and situated in the heart of a wilderness.

Appellant also excepted to the amount of compensation claimed by McLaughlin. In the restated account McLaughlin charged a salary in the amount of $17,750 and a commission of 5% of all sums received for his services as manager of the venture. The court below concluded that McLaughlin's work in developing Moosic Lake and conducting the business of the project clearly warranted remuneration at the rate of $250 a month, or $3,000 a year, and therefore approved the salary claimed. The court, however, properly disallowed McLaughlin the amount of commissions charged by him on the ground of duplicate compensation.

This Court has frequently said that the true test for determining a trustee's commission is compensation for the responsibility incurred and the service and labor performed: *Harrison's Estate*, 217 Pa. 207, 209, 66 A. 354; *McCaskey's Estate*, 307 Pa. 172, 160 A. 707; *Gardner's Estate*, 323 Pa. 229, 238, 185 A. 804; *Strickler Estate*, 354 Pa. 276, 277, 47 A. 2d 134. In the latter case Mr. Justice STEARNE said: ". . . Fixing the amount of compensation is peculiarly within the discretion of the court below, which in most cases is better able to judge as to the reasonableness of such charges than the appellate court. Unless such discretion is clearly

abused, the judgment of the court below will not be disturbed."

When we consider the extraordinary services rendered by McLaughlin which are obvious on the record and for the most part stand uncontradicted, we are of the opinion that he was entitled to considerably more than ordinary compensation. From the moment McLaughlin assumed the office of trustee he devoted himself almost exclusively to the Moosic Lake development. For all practicable purposes he divorced himself from any outside practice of law over this five year period. He supervised the work of all employes, salesmen and contractors. He testified that he had written about 500 deeds or contracts, had innumerable meetings, day and night, Sundays and holidays, with the residents on complaints, served on various committees to promote sociability, saleability and settle disputes and on many occasions had travelled throughout the east at his own expense to ascertain the most modern method for developing a lake resort. He also handled most of the legal business for the trustees. Through his skill, foresight and initiative a club was formed, roads were built and numerous other improvements were constructed to make the enterprise productive. These are but a few of the many activities which attest to the arduous and prolonged labors of McLaughlin in his endeavor to work out a solution advantageous to all concerned.

The $10,000 fee charged by McLaughlin and Stark under the first agreement of September, 1938 is also questioned. However, it is evident from the trust agreement and the testimony that this fee included compensation for their efforts during the two year period in which that agreement was in effect. We agree with the court below that while apparently large on its face, it was not exorbitant when we consider the effort which

was expended by them during that period in securing the refinancing of the debt and the organization of the property for future development. The attorneys did not confine their activities to purely legal duties, but obligated and devoted themselves to the promotion and management of the property.

It is argued next that the trustees should be surcharged in the amount of $12,169.52 as monies improperly loaned to the Moosic Lakes Club. We first note that appellant is not in a position to question the propriety of the trustees' acts in conveying certain parcels of the property to the club since he had acquiesced in these transactions over a long period of time. A competent beneficiary who, having full knowledge of the facts, by acquiescence consents to and affirms the conduct of the trustee with respect to the trust property is precluded in the absence of fraud from subsequently questioning the propriety of such conduct: *Ward Estate*, 350 Pa. 144, 146, 38 A. 2d 50; *Simmers et al v. Simmers*, 339 Pa. 170, 172, 14 A. 2d 120; *Strawbridge's Estate*, 322 Pa. 406, 185 A. 726; *Stephen's Estate*, 320 Pa. 97, 102, 181 A. 559. Shortly after the erection of this community project both of the lakes and two pieces of property surrounding the lakes known as the East and West Commons were deeded to the club. Extensive improvements were made to a beach house on one of these Commons which was also conveyed to the club together with a ball field. It is inconceivable that Burke would be completely unaware of such obvious transformations and the manner in which they were made, occurring over the five year period. He was a voting member of the club and occupied a summer home on the property conveyed to him by the trustees. He of all persons was the one most interested in the progress and success of the development and how its objectives were being attained. In

any event it is unnecessary to pass upon the propriety of these conveyances for the question is not presented in appellant's statement of questions involved which limits the scope of the appeal.[4] Indeed appellant makes no contention in his brief in this regard. However, he does challenge the loans made to the club in his statement of questions involved and in his argument.

The Moosic Lakes Club was the magnet to attract purchasers in the development and disposition of the trust property. From a real estate standpoint the lakes themselves were of little or no value. The club used the monies loaned to it for the improvement and enhancement in value of the entire Moosic Lake area, by extensive permanent improvement of roads and other facilities which served as an inducement and stimulus in the sale of lots, and from which appellant unquestionably benefited. These undertakings, if not effected by the club, would have had to be accomplished by the trustees to attain the success which the development project achieved. The situation at the time of the restated final account was that all expenses of the maintenance of the club, roads and recreational facilities were covered by the membership dues, thus relieving the trustees to that substantial extent.

It was argued on behalf of appellees that under the by-laws of the club, which were introduced into evidence, the trustees (and thereafter their assignee, the Moosic Lakes Corporation) controlled the club and could readily cause the monies loaned to be repaid; that the club was the alter ego of the trustees and since the monies loaned went to the improvement of the trust property, the making of the loans was justified under the broad and comprehensive powers of the trustees,

---

[4] *Macfarlane's Estate*, 317 Pa. 377, 383; *Commonwealth ex rel. v. Seventh Day Baptists et al.*, 317 Pa. 358; *Reese v. Pittsburgh et al.*, 313 Pa. 32.

as the exercise of sound business judgment, especially since it resulted in a saving of income tax and relieved the trustees of substantial maintenance expenditures; that the loans were in fact expenditures indirectly made for the improvement of the trust property.

We think there is much merit in this argument, but that more conclusive against appellant's complaint as to these loans is that in our opinion appellant was estopped from questioning them. The 1940 agreement provided that any party thereto had the right to receive an accounting from any other party of any monies received or disbursements made. Appellant exercised this right. McLaughlin testified that every year the trustees rendered an annual accounting to the appellant. Two of these, prepared for the trustees by J. F. Cleary Company, an accounting firm, with registered mail return card receipts, the one signed by appellant and the other by an attorney for appellant, were introduced into evidence. McLaughlin also testified that appellant from time to time had three different auditors go over the books and bank records of the trustees, and that an attorney for appellant made an itemized check thereof and received an explanation of every item about which information was sought. One of appellant's auditors, Isaacs, a bank examiner, was given a key to the trustees' office. Despite the return card receipts signed by appellant and his attorney in the case of at least two of the annual accountings, appellant testified that he never received any accounting. There was no testimony by appellant nor any testimony adduced on his behalf denying that his auditors and his attorney examined and had access to all of the trustees' books and records throughout the trusteeship. It was not claimed that the trustees failed to set forth each and every receipt and disbursement. The conclusion is inescapable that appellant must have had knowledge of the loans

in question and every other financial transaction. While there is no specific finding of fact by the chancellor in this regard, it is clear from his dismissal of appellant's exception to the making of the loans and the tenor of his opinion which upholds the integrity and good faith of the trustees that he accepted McLaughlin's testimony and rejected the appellant's.

The appellant not only challenges the propriety of the loans but also the fact that they were made without any security or provisions for repayment. It is of course true that ordinarily a trustee may not loan trust funds without security. We think it a fair assumption that through the examination of the trustees' records by his auditors and attorney, appellant not only knew of the loans but the manner in which they were made. In any event, he unquestionably is chargeable with knowledge of their making. He suffered no loss but on the contrary benefited from the loans, and under all the circumstances presented, the chancellor was justified in refusing to impose a surcharge. ". . . That a court of equity may in its discretion refrain from inflicting penalties which it considers unjust under the circumstances is beyond dispute." *Guthrie's Estate,* 320 Pa. 530, 538, 182 A. 248.

The only other specific complaint that merits consideration is the alleged unauthorized act of organizing the Moosic Lakes Corporation and conveying the property of the trust to the corporation. Under the second agreement of September 19, 1940 between the parties, it was expressly provided that the trustees could at their option transfer the property to a corporation for the purpose of liquidating it and dividing the profits between them when the proceeds of all sales were sufficient to pay the expenses of obtaining a fee simple title, all advancements, counsel fees and operating expenses. Appellant admits that the second agreement

empowers the trustees to form a corporation for such purpose but contends that it could not be done at this time because the trustees' claims were still outstanding. As the learned judge below observed: ". . . if the Trustees were permitted to liquidate their claim by accepting land, all of the conditions contemplated by paragraph 2 of the agreement of September 19, 1940 would have been accomplished and the Trustees would have their option of liquidating the estate in one of various ways, including transferring the corpus to a corporation. We see no reason why they should not do so if the only claims outstanding are their own. Objection to this procedure would seem to be captious, especially when it is considered that the Exceptant for the first time in years returns to a measure of control over the res." Bearing in mind what was set forth earlier in this opinion regarding the satisfaction of any indebtedness due to McLaughlin and the Stark interest out of the trust res, we think the chancellor properly disposed of this exception.

We cannot agree with appellant's suggestion that the second agreement was a hard and oppressive bargain in which Stark and McLaughlin took unfair advantage of their client. The record discloses that the appellant did not deal exclusively with these two attorneys but sought the advice of independent counsel, Mr. Gunster, an able and experienced member of the bar. In consultation with Mr. Gunster, the attorneys expressed their willingness to withdraw from the proposed agreement if they were reimbursed for their advances and paid for their services. Where the highest integrity and utmost good faith—as was evidenced here—characterizes a transaction between attorney and client, bad faith will not be imputed merely because the attorney seeks to protect his own interests. Although it is asserted that the appellant has received

nothing since the inception of the first agreement and is no better off today than he would have been if he had allowed the bank to foreclose, the record shows the contrary. At the time the second agreement was executed, record title to the property was in the bank, appellant having lost his interest in the land by default. Subsequent to that agreement Stark conveyed back to the appellant without consideration his apartment house in the Borough of Dunmore, Pennsylvania and a substantial piece of land at Moosic Lake, which appellant used as a summer home. His debt of $25,400 and all taxes and liens against the property at Moosic Lake and in the Borough of Dunmore were paid by the trustees and he receives 100 shares of stock in the Moosic Lakes Corporation, which represents a one-third interest in the land still available for sale. Over 2,000 acres out of 3,000 remain to be sold and its value was estimated by a real estate appraiser to be between $140,000 and $145,000.

Appellant cannot fairly criticize the integrity and sagacious judgment of the trustees. The record does not cast a shadow of suspicion on their good faith. Appellant acquiescently stood by while they were prosecuting their development plans. It was only when the project proved profitable that appellant resorted to adverse proceedings, relying almost entirely on legal technicalities which we have found under the circumstances to be without merit. It would be a manifestly unjust administration of equity to visit upon the trustees the consequences of the surcharges here sought. Fortunately the law does not require us to do so.

Decree affirmed at appellant's cost.