## Wolfsohn Estate

*J. Pennington Straus, of Schnader, Harrison, Segal & Lewis,* for accountants.

*Bernard J. Frankel, of Fox, Rothschild, O'Brien & Frankel,* for widow.

*Irvin Stander, Harry W. Kurtzman* and *Louis Marion,* for Commonwealth.

*David Berger*, City Solicitor, *E. Louis Rosen*, Assistant City Solicitor, and *Edward B. Soken*, for City of Philadelphia and School District of Philadelphia.

KLEIN, P. J., March 29, 1960.—Nat Wolfsohn, also known as N. N. Wolfsohn, Nat N. Wolfsohn, Nathaniel Wolfsohn and Nathaniel N. Wolfsohn, died on July 4, 1956, without issue, leaving to survive him his wife, Florence Wolfsohn, now Nacmias, and leaving a will which was admitted to probate on August 29, 1956, when letters testamentary were granted. Proof of advertisement of notice thereof was produced at the audit of the executors' first account, upon which an adjudication was filed by the present auditing judge on April 30, 1958.

The terms and provisions of testator's will were fully recited in the aforesaid adjudication of April 30, 1958, and need not be recapitulated in this adjudication. A photostatic copy of the will, certified by counsel to be a true and correct copy, is annexed hereto.

Most of the facts and circumstances in connection with the administration and distribution of testator's estate were fully discussed and adjudicated in the aforesaid adjudication of April 30, 1958, at which time the balance for distribution, after the award of decedent's personal effects, furniture, etc., was awarded back to the accountants for further administration and accounting, in accordance with the terms of the will and agreements of the parties referred to therein, subject, however, to payments already made on account of distribution to Florence Wolfsohn and Philip Wolfsohn, as per distribution account, in accordance with decrees of this court, dated August 29, 1956, and October 31, 1957, respectively.

The fund so awarded back to the accountants is the fund presently accounted for and, except as herein-

after recited, there appear to be no further questions to be adjudicated by the present auditing judge.

Item eighth of testator's will directs that the first of David H. Solms and Dolph W. Zink to cease to be employed by Eastern Mortgage Service Company, should likewise cease to be an executor and trustee, and should be succeeded by Philip Wolfsohn, decedent's surviving brother. The statement of proposed distribution recites that the stock interest of the estate in Eastern Mortgage Service Company was sold at private sale to Colonial Mortgage Service Company pursuant to decree of this court on June 10, 1959, and thereafter Colonial Mortgage Service Company became a successor by merger to Eastern Mortgage Service Company. At the time of the purchase, Dolph W. Zink tendered his resignation as an officer of Eastern Mortgage Service Company, and consequently, Philip Wolfsohn became empowered to serve as executor and trustee in his place. David H. Solms, on the other hand, continued in the employ of the merged company, and by virtue of this continued employment, and at the request of the other fiduciaries, will continue to serve as executor and trustee under the terms of decedent's will. A petition is filed with this statement suggesting the succession of Philip Wolfsohn and the resignation of Dolph F. Zink. By decree of even date herewith, the resignation of the said Dolph W. Zink, as executor and trustee, was approved, and Philip Wolfsohn was authorized to carry out the provisions of the trust, as cotrustee with David H. Solms, Charles F. Toewe, Fred L. Rosenbloom and the First Pennsylvania Banking and Trust Company.

All parties in interest appear to have had notice of this audit.

Payments of inheritance tax to the Commonwealth of Pennsylvania were noted in the adjudication of April 30, 1958, on the executors' first account, and

receipts, vouching such payments, were produced to the auditing judge at that audit. However, Messrs. Stander, Kurtzman and Marion, representing the Commonweatlh of Pennsylvania, entered an appearance, claiming such transfer inheritance tax as may be due and assessed and objecting to the executors' compensation claimed in the account. The awards herein contained will accordingly be made as requested in the statement of proposed distribution, subject to the payment of such transfer inheritance tax as may be found to be due, as the same may be duly appraised and assessed.

Credits are taken in the executors' first and second accounts for payments aggregating $300,000, designated "compensation to executors" for their services. This is equivalent to slightly less than five percent of the inventoried value of the estate which totaled $6,222,869.14.

Mr. Frankel, one of the most respected and able members of our bar, stated, in behalf of the surviving widow, that he had no objections to the allowance of the amount claimed. He added: ". . . from what I know of this case and the difficulties the executors have had in administering the estate and the excellent job they have done, although the fees and commission may seem large, I think they have been well earned."

As stated above, Mr. Stander, on behalf of the Commonwealth of Pennsylvania, which is the only other party in interest, objected to the amount of the commissions because the register of wills had "no guideposts" to enable him to determine the value of the executors' services in an estate of this size and character. He stated, further, that they were perfectly willing to leave the matter rest with the court "as to the determination of the value of these truly extraordinary services."

This is a most unusual case and the services rendered by the executors have been unique in character and much more complex and demanding than those which confront fiduciaries in the ordinary case.

Decedent, Nat Wolfsohn, was an imaginative, hard-working genius, who, by his own efforts, built up a large and complex business empire, of which the Eastern Mortgage Service Company was the keystone. This company performed a unique service. It placed tens of thousands of mortgages on homes in new building developments and then sold them to insurance companies, savings banks and other financial institutions. The company processed these mortgages for a fee and collected interest and amortization payments for the mortgagees.

At the time of decedent's sudden death, in July 1956, his business interests had reached their apex and his passing left this vast business empire without a leader.

In addition to the Eastern Mortgage Service Company and a wholly owned subsidiary, Eastern Agency, Inc., which owned all of the outstanding stock of United Title Agency, a title insurance business, decedent, when he died, had interests in 26 companies actively engaged in real estate development and construction. Decedent was the sole owner of 17 of these companies and had interests varying from one-third to one-half in the remaining nine.

The total real estate holdings of these companies included approximately 500 acres of unimproved ground, 1,000 lots subdivided and ready for development, several apartment houses, shopping centers, single-family dwellings and two industrial plants, all with a total inventory value (as to decedent's interest) of $1,251,732.86. The book value at the time of death of the estate's interest in these holdings was $950,-529.03, the difference of $301,203.83 being attributable to profits realized on sales made or negotiated by

the executors between the date of death and one year thereafter, when the inventory was filed.

In addition to these complex assets, testator owned accounts receivable totaling $238,654.53, representing the balance of the liquidation proceeds of 16 real estate development companies, whose liquidation was begun in his life-time. He also owned miscellaneous stocks worth about $50,000, notes and mortgages receivable of $745,000, including a $650,000 note of Eastern Mortgage Service Company, and approximately $100,-000 of miscellaneous real estate.

The executors were amazingly successful in liquidating the manifold assets of the estate.

The principal asset, of course, was the Eastern Mortgage Service Company with a net book value of $2,600,840.70. This company had over 150 employes and was servicing approximately 25,000 separate mortgages with an aggregate value of about $200,-000,000 for more than 200 financial institutions. In spite of the crisis caused by Wolfsohn's sudden death, in a seriously declining mortgage market, the executors realized $4,155,000 from this company for the beneficiaries of this estate. This represents a gain of $355,000 over the figure of $3,800,000 which was the market value appraisal at the time of death, and the figure set forth in the inventory which was accepted by both the State and Federal taxing authorities.

The results obtained by the executors in liquidating the 26 real estate companies, owned in whole or in part by testator, was equally remarkable. These affiliates were inventoried for $1,251,732.86. The executors disposed of them for $1,442,150.03, or a net gain of $190,417.17.

These liquidation operations required great effort and extraordinary devotion to duty on the part of the executors. Instead of disposing of these companies by quick sale at auction or through brokers, the execu-

tors undertook large-scale construction and development activities. They built and sold more than 500 individual dwellings in the course of their administration. Unimproved acreage was subdivided into lots and sold to other developers. In addition, nearly 200 acres of undeveloped land was profitably liquidated.

Questions involving compensation of executors and other fiduciaries have been before our courts on countless occasions in the long history of our Commonwealth. A great many cases involving every phase of the problem are cited in 1 Hunter, Pa. Orphans' Court Commonplace Book (2d ed.) starting at page 251, under the title "Commissions." From a careful study and analysis of these cases several basic rules can be ascertained:

1. That fiduciaries are entitled to fair and just compensation;

2. That such compensation is based upon the responsibility undertaken, the care, skill, time and labor expended, the difficulties encountered in the administration and its success as a whole;

3. That although, as a matter of convenience, the compensation may be fixed by rule of thumb as a percentage of the fund involved, the true test is always what the services were actually worth under all the circumstances of the case; and

4. That each case is sui generis.

The present case is almost without parallel in the history of this busy court. Although the executors were administering the estate of a single individual, his holdings were so varied and complex as to make more demands upon the time and judgment of the executors than the problems of a dozen ordinary cases of similar size.

There are several cogent factors which convince the auditing judge that the compensation claimed by the

executors is fair and reasonable for the services which they performed.

The fact that testator named a trust company and four individuals is most significant. The First Pennsylvania Banking and Trust Company, the corporate executor, was successor by merger to the First National Bank of Philadelphia, where decedent banked for many years and whose officers were familiar with decedent's business activities. These officers are now associated with the merged company. The four individuals selected by decedent were all men of wide experience in business, finance or law. Charles F. Toewe, general partner of Main and Company, certified public accountants, had been decedent's accountant for over 15 years. Fred L. Rosenbloom, a senior partner of the law firm of Schnader, Harrison, Segal and Lewis, and one of the country's foremost tax authorities, had been counsel, both for decedent, personally, and for his various companies. The other two executors, David H. Solms and Dolph W. Zink, were employed by Eastern Mortgage Service Company, as executive vice-president and vice president, respectively.

The qualifications of the executors selected by testator constitute an important consideration in determining the amount of their compensation. Mr. Wolfsohn must have known that all of the individuals he selected were busy men, successful in their callings and accustomed to obtaining substantial sums for their services. Testator must be assumed to have known that the executors he designated could not, in fairness to their own affairs, devote the time and energy necessary to administer this complex estate for the compensation allowed in the ordinary, run-of-the-mill case. See McCaskey's Estate, 307 Pa. 172 (1932). The record clearly indicates that the executors devoted a vast amount of time over a three and a half year

period to their administrative responsibilities. This included 106 formal meetings at which minutes were kept, weekly meetings of the executive committee of Eastern Mortgage Service Company, as well as meetings of decedent's affiliated corporations. It is crystal clear that the demands of the estate made great inroads into the working hours of all of the individual executors and the agents of the corporate executor over the entire period since letters testamentary were granted to them.

A second factor which added to the executors' burdens was the hostility of testator's widow, arising from the fact that decedent had excluded the stock of Eastern Mortgage Service Company, his most valuable asset, from her marital share. She filed a caveat to the probate of the will. After several months of active negotiations, an agreement was reached whereby the widow terminated the caveat proceedings, filed an election to take against the will and received a one-half share of the estate, including a one-half interest in the stock of the company. In spite of the amicable settlement of this phase of the estate, other disputes led to litigation with the widow in the Law Division of the Superior Court of New Jersey and two other cases in this State, which were appealed to the Supreme Court.

In the course of the administration, the executors purchased the widow's 50 percent interest in the capital stock of Eastern Mortgage Service Company for $1,900,000 and later sold the 100 percent, which the estate then owned, at a higher price to Colonial Mortgage Service Company. The intelligent and energetic manner in which these two transactions were consummated by the executors is most praiseworthy, and produced a most advantageous result for the estate.

Perhaps the most important circumstance in justification of the compensation claimed by the executors

is the character of the assets which formed decedent's estate. Although the assets which came into the possession of the executors consisted primarily of shares of stock of corporations owned wholly or in a large part by decedent, the assets of these corporations consisted primarily of undeveloped ground, individual residences and other improved real estate.

A personal representative is empowered to employ a real estate broker to sell the real estate belonging to decedent's estate and to pay such broker the usual commission of five percent for his services in effecting a sale. See Burke Appeal, 378 Pa. 616 (1954). When such commission is paid, the fiduciary is ordinarily entitled to receive an additional commission of three percent for his services. See cases cited in Hunter's Pennsylvania Orphans' Court Commonplace Book, supra, page 257.

In the present case the record discloses that the executors disposed of dwellings owned by decedent's corporations for $12,376,786.38 at a cost totaling only 1.037 percent of the sale price, or $128,300.21, and land for $1,533,891.28 at a cost of 1.582 percent, or $24,265. If the executors had sold these dwellings and land in the usual manner by employing real estate brokers and paying them the customary commissions, these commissions alone would have aggregated approximately $450,000, or 50 percent more than the total compensation claimed by the five executors.

The auditing judge is completely satisfied, from his study of this record and his personal knowledge of the services rendered by the executors, gained from the many conferences held with counsel in his chambers and the hearings in court, that the aggregate compensation of $300,000, for which they have taken credit in their accounts, is fair and reasonable. Of the total compensation of $300,000 claimed by the executors, $45,000 was credited in the first account, which

was confirmed by the present auditing judge on April 30, 1958. At that time, determination of the question of final commissions was deferred until the present accounting. The remaining $255,000 is credited in the executors' second account, which is now before the court for audit, and the same will be confirmed as stated. . . .

And now, March 29, 1960, the account is confirmed nisi.