**In re W. Byron SCHLAG, Debtor.**

**W. Byron SCHLAG and Lee R. Schlag, Plaintiffs,**

**v.**

**Leonard M. MENDELSON, William R. Grove, Jr., E.D. Hollinshead, Jr., in their own right and as Trustees for the benefit of James R. Mendelson, Ann J. Mendelson, Kathy S. Mendelson and Ann M. Rosenberg, Defendants.**

**Bankruptcy No. 85–2163.**
**Adv. No. 88–0094.**

United States Bankruptcy Court, W.D. Pennsylvania.

March 2, 1989.

Kenneth P. Simon, Simon & Simon, Pittsburgh, Pa., for debtor.

David L. Nixon, Hollinshead & Mendelson, Pittsburgh, Pa., for defendant/Leonard M. Mendelson.

Carlota M. Bohm, trustee, Schaffler & Bohm, Pittsburgh, Pa.

Stephen I. Goldring, Pittsburgh, Pa., Asst. U.S. trustee.

## MEMORANDUM OPINION

BERNARD MARKOVITZ, Bankruptcy Judge.

Before the Court is Plaintiffs' Multi-Count Complaint alleging Breach of a Partnership Agreement, Abuse of a Confidential Relationship, Unjust Enrichment, Usurpation of a Partnership Opportunity, and Constructive Fraud by the various Defendants. The central issue in this case involves the attorney-client relationship between Defendant, Leonard M. Mendelson ("Mendelson") and the Plaintiffs, the cessation of same, and the propriety of certain business dealings between these parties in conjunction therewith. The parties have stipulated to a number of facts; many other facts have been determined by this Court, as a result of our observation of the witnesses during their testimony and the documentary evidence presented at trial. Based upon the credible facts, and the applicable law in this area, we find in favor of the Defendants on all counts.

## FACTS

Prior to April of 1980, Plaintiff, Lee Schlag, became aware that a 16 acre tract of land was to be auctioned by the Pennsylvania Turnpike Commission ("Turnpike property"). This land was in a prime development area and appeared to be a good acquisition; however, it was without a right of way to an access road and this "landlocked" status seriously decreased its commercial value. Plaintiffs were aware that Defendant Mendelson, an attorney licensed to practice in Pennsylvania, was experienced in the area of real estate condemnation law and they sought his representation in their attempts to secure a right of way. An attorney-client relationship was formed on or about April 14, 1980 for the express purpose of obtaining said right of way.

Plaintiffs attended the Turnpike Commission's auction and were the successful bidders on the property with an offer of $100,000.00. The closing was scheduled to occur within 120 days thereafter; however, Plaintiff had no financial ability to consummate said deal.

Subsequent to the auction, Plaintiffs pursued preliminary sales negotiations with Ectrav, Inc., as agent for Red Roof Inns, for approximately three (3) acres of the Turnpike property. Consummation of these preliminary negotiations was contingent upon Plaintiffs' obtaining a right of way to the subject acreage.[1] During this same time period, Mendelson proceeded to handle the condemnation proceedings. In that vein, he contacted two (2) other attorneys, not associated with his law firm, to assist him in his endeavors. These two attorneys, Lee McCandless and Benjamin B. Wechsler, II, were also enlisted for special purposes. McCandless, suggested by Plaintiffs, was contacted because he was an attorney practicing in the county where the land was situated and was generally familiar with real estate matters. McCandless also served as executor of Mrs. Schlag's decedent estate. Wechsler was engaged because he had developed an expertise in the prosecution of private condemnation actions, and present parties were seeking a right of way from the private owner of the land adjoining that being purchased by Plaintiffs.

Plaintiffs were not able to obtain the necessary financing to close the transaction with the Turnpike Commission within the 120 day period. They sought and received a 3-month extension, with the closing set for November 24, 1980. During the months prior to said closing, Plaintiffs were negotiating with North Side Deposit Bank ("Bank") regarding financing for the acquisition of the property. Plaintiffs sought to borrow $125,000.00, or one hundred twenty-five percent (125%) of the sales price, to close the deal and begin development of the property, including an access road to the main traffic artery. Early in November the Bank advised Plaintiffs that collateral, in addition to the property to be acquired, would be necessary before financing of this acquisition could be ar-

---

1. The actual parties to the sale were Ectrav Inc. and Lescho Corporation, a corporation formed by Lee Schlag for the purpose of purchasing the Turnpike property.

ranged. Plaintiffs approached Mendelson, seeking his intercession on their behalf: he contacted the necessary parties at the Bank, but they were adamant. Plaintiffs did not want to lose the property and Mendelson believed the transaction was financially feasible once the right of way was obtained. Plaintiffs requested Mendelson's assistance in the purchase, by his cosigning of the Note to the Bank; Mendelson did so on November 14, 1980, and in connection with one of his partners, William R. Grove, fully collateralized the $125,000.00 loan. In exchange for this assistance, Mendelson received a thirty-five percent (35%) interest in the property and Grove received a fifteen percent (15%) interest.

Mendelson insisted that their relationship of attorney-client be terminated, a partnership be created, and that the agreement between the parties be committed to writing. Plaintiffs were directed by Mendelson to seek independent counsel regarding this partnership arrangement. Jay Glasser, an associate in Mendelson's firm, spent several hours over the course of two (2) days working on a draft of this agreement. Thereafter, it was transmitted to Plaintiffs and their attorney, Robert Smiley.[2] Over the course of several days, including the weekend prior to the Monday, November 24, 1980 closing date, Glasser and Smiley made numerous changes and amendments to the original draft. Ultimately, on the day of closing, a fourth and final agreement was executed among the parties which created a new business relationship between Plaintiffs and Defendants. Plaintiffs executed two (2) mortgages in favor of Mendelson and Grove to secure the obligation set forth in the agreement.

At the closing with the Turnpike Commission, Plaintiffs were represented by a third attorney, Ronald F. Hartman, who has not been associated with Mendelson or Grove, nor with McCandless or Wechsler. Hartman's representation was limited, by Plaintiffs, to the closing.

Thereafter McCandless continued to pursue the condemnation proceeding. Wechsler was also retained by Plaintiffs to assist them in pursuing various legal matters, both in connection with their interest in the subject property as well as in various other legal matters.

In February of 1981 Plaintiff Lee Schlag approached Mendelson, regarding another loan he was trying to obtain, this time through a Florida bank. Said bank would only consider providing the loan if Mendelson and Grove would accept a subordinated mortgage position on the Turnpike property. Mendelson and Grove refused to do so, and the Florida bank terminated negotiations.

Although the reason for said loan was not offered, Plaintiff Lee Schlag again approached Mendelson, this time seeking to have Mendelson provide the financing on the same terms as negotiated with the Florida institution. Mendelson did not choose to be involved personally; however, he spoke with his partners, Earl Hollinshead and Grove, regarding same. Hollinshead served as Trustee for various trusts created on behalf of Mendelson's children. He, as Trustee, and Grove, individually, agreed to make a loan to the Schlags of $85,000.00. The trust contributed seventy percent (70%) and Grove contributed thirty percent (30%). This loan is evidenced by a Note executed February 27, 1981, secured by a mortgage on Plaintiffs' remaining fifty percent (50%) interest in the Turnpike property. The documents comprising this agreement were prepared by Wechsler for and on behalf of the Plaintiffs.

Concurrently with these activities, Mendelson continued to pursue the condemnation on behalf of the partnership; however, the private land owner was presenting a very vigorous defense. Simultaneous negotiations to purchase the right of way culminated in an agreement of sale for a purchase price of $115,000.00. The Plaintiffs were obligated to pay fifty percent (50%), or $57,000.00. They were able to

---

2. Smiley had previously represented Schlag in another real estate matter and had known the family for many years.

raise only $37,500.00, and asked Mendelson to loan them the additional $20,825.00.[3] Mendelson agreed to the advance in exchange for which the Plaintiffs executed a demand Note on March 10, 1981.

Once the right of way was secured, the Ectrav closing was able to proceed. This closing occurred in two stages: with Plaintiffs on November 17, 1981 and with Mendelson and Grove on January 4, 1982. Plaintiffs' portion of the proceeds ($67,896.02) was credited to the $85,000.00 mortgage and judgment held by Grove, individually, and Hollinshead, Trustee.[4] On the same date, Defendants agreed to forebear on the remainder of the $85,000.00 Note and also on the $20,825.00 Note, until June 1, 1982. The loans were not repaid on that date and went into default.

In September and October 1983, Mendelson and Grove repaid the entire $125,000.00 debt owed to the Bank. Thereafter, Hollinshead, Trustee, commenced a mortgage foreclosure action against Plaintiffs. The case was tried on August 23, 1983, in the Court of Common Pleas of Butler County, Pennsylvania, wherein issues similar to the issues raised herein were or could have been raised. Judgment in mortgage foreclosure was rendered for Hollinshead, Trustee.

The property was scheduled for Sheriff's Sale on January 13, 1984. One (1) day prior thereto, Hollinshead, Trustee and Mendelson entered into an Agreement of Sale with Plaintiffs to permit Plaintiffs to repurchase their one-half (½) interest in the property, conditioned upon Defendants being the successful bidders at Sheriff Sale. By Agreement of the same date, Mendelson and Grove, owners of the other one-half (½) interest in the property, agreed to sell their interest to Byron A. Schlag, son and brother of the Plaintiffs, same being conditioned upon Hollinshead, Trustee, being the successful bidder at Sheriff's Sale. Concurrently, by quit claim deed, Plaintiffs

transferred their interest in the Turnpike property to Hollinshead, Trustee. Plaintiffs were represented in these transactions by Daniel Dixon, an experienced attorney practicing in this State, and not affiliated with any of the other attorneys previously retained by Plaintiffs. Hollinshead was the successful bidder at the Sheriff's Sale on January 13, 1984, and he, as Trustee, became the owner of the Plaintiffs' interest in the Turnpike property. Plaintiffs and Byron A. Schlag thereafter defaulted on the Sales Agreements of January 12, 1984. As of that time they no longer owned any portion of the Turnpike property, nor did they possess any right to acquire same.

Plaintiff, W. Byron Schlag, filed a Chapter 11 bankruptcy petition in 1985; the case was converted to a Chapter 7 proceeding on August 11, 1987. It is noteworthy that during the course of this bankruptcy case and adversary proceeding, Plaintiffs have retained three (3) additional, separate and distinct attorneys and/or law firms to provide counsel and representation.

## ANALYSIS

Initially it should be noted that over the years various legal proceedings have occurred in courts of competent jurisdiction, wherein the issues now before this Court have been raised or could have been raised. This Court is aware of at least three (3) separate instances wherein these questions were raised. One such court found one of the Plaintiffs to lack credibility. Were it not for the fact that this case can be decided on its substantive facts without undue difficulty, this case could be decided on the basis of estoppel or res judicata.

The courts have set a very high standard of fidelity which attorneys must meet when involved in property transactions with their clients. The Code of Professional Responsibility, as adopted by the Supreme Court of Pennsylvania, states as follows:[5]

3. The $825.00 represents certain closing costs.

4. Certain other sums advanced by Ectrav prior to closing, for municipal escrows, were offset at closing, thereby reducing the proceeds available to the parties.

5. The ABA Code of Professional Responsibility was in effect at the time of all relevant transactions in this case. The Model Rules of Professional Conduct were not adopted until April of 1988. *See In re Corn Derivatives Antitrust Litigation,* 748 F.2d 157 (3rd Cir.1984); *In re East-*

After accepting employment, a lawyer should not acquire property rights that would adversely affect his professional judgment in the representation of his client. Even if the property interests of a lawyer do not presently interfere with the exercise of his independent judgment, but the likelihood of interference can reasonably be foreseen by him, a lawyer should explain the situation to his client and should decline employment or withdraw unless the client consents to the continuance of the relationship after full disclosure ...

Ethical Consideration 5–3.

A lawyer shall not enter into a business transaction with a client if they have differing interests therein and if the client expects the lawyer to exercise his professional judgment therein for the protection of the client, unless the client has consented after full disclosure.

Disciplinary Rule 5–104(A).

■ Numerous courts have interpreted this language to require the exercise of perfect good faith in attorney-client transactions; to strengthen an attorney's complete loyalty and fidelity in the representation of his client's interest. *Office of Disciplinary Counsel v. Witmaack*, 513 Pa. 609, 522 A.2d 522 (1987). The courts will not tolerate even the shadow of a deception, and jealously scrutinize all such transactions to avoid any relaxation of this standard. *Meara v. Hewitt*, 455 Pa. 132, 314 A.2d 263 (1974); *Kribbs v. Jackson*, 387 Pa. 611, 129 A.2d 490 (1957); *Lynch v. Hook*, 298 Pa.Super. 27, 444 A.2d 157 (1982); *See also, Ruth v. Crane*, 392 F.Supp. 724 (E.D. Pa.1975), *aff'd* 564 F.2d 90 (3rd Cir.1977). The burden is on the attorney to show he did not abuse any attorney-client relationship, gain personally by any legal misrepresentation, or fail to advise and protect. *Meara v. Hewitt, supra; Points v. Gibboney*, 340 Pa. 522, 17 A.2d 365 (1941).

■ By the same token, the law does not prohibit an attorney from entering into transactions with clients, nor does it require any such activity to provide unfavor-

ably for the attorney. Where a transaction between an attorney and his client is characterized by high integrity and good faith, the courts will not impute bad faith simply because the attorney sought to protect his own interest. *Ruth v. Crane, supra; Appeal of Burke*, 378 Pa. 616, 108 A.2d 58 (1954). Furthermore, in analyzing these transactions for fairness and conscionable activity, the courts take into consideration several variables, such as the sophistication of the client. *Stainton v. Tarantino*, 637 F.Supp. 1051 (E.D.Pa.1986).

■ In the instant case, the Schlags have played Russian roulette for nearly nine (9) years and have reached the final chamber. These are sophisticated businessmen; real estate brokers and property developers who were careful to spread their legal demands among numerous unaffiliated lawyers, so that none was able to exert anything remotely resembling control over the Schlags. Mendelson's firm was hired to create a corporation, attend an auction and pursue a condemnation proceeding. The firm did not handle the Turnpike property closing, the estate of W. Byron Schlag's wife, or any of the Schlags' collection litigation. All three of those activities occurred within months after Mendelson was retained and each was handled by a different attorney. Since that time the Schlags have hired no fewer than four (4) other firms. Their present attempts to convince this Court that they have sworn fealty to Mendelson is ludicrous. For the Schlags to claim abuse of a confidential relationship is both frivolous and absurd.

Plaintiffs saw a potentially lucrative business opportunity and rushed forward to pursue it without serious consideration to their financial ability to pay their way. They initially required 125% financing; when no institution would agree to this proposal, they approached and convinced one of their lawyers to help them. At that point, Defendant, of necessity, explained that the attorney-client relationship must be terminated and a business relationship

*ern Sugar Antitrust Litigation*, 697 F.2d 524 (3rd Cir.1982); *American Dredging Co. v. City of Phil-* *adelphia*, 480 Pa. 177, 389 A.2d 568 (1978); 42 Pa.C.S.A. (Purdon's 1975).

established. It was made clear to Plaintiffs that Defendant would be representing himself and/or the partnership in matters wherein he and/or it had an interest. Plaintiffs selected and retained their own counsel to protect their individual position. These newly selected attorneys represented Plaintiffs admirably and with professional probity. Unfortunately for Plaintiffs, even the best efforts of some of the finest lawyers in this district could not save Plaintiffs or their position. Plaintiffs probably needed protection from themselves and/or the public, or the bar needed protection from Plaintiffs.[6]

Plaintiffs and Defendants were business partners in a business relationship. Although Defendants prepared some of the legal documents in the condemnation proceedings, these actions were performed for the Defendants' benefit and for the partnership as a whole. No personal legal services were being performed for Plaintiffs, although as partners they benefited from the legal work performed. No breach of a fiduciary relationship occurred and Defendants violated no ethical standards or disciplinary rules.

An appropriate Order will be issued.

## ORDER OF COURT

AND NOW at Pittsburgh in said District this 2nd day of March, 1989, in accordance with the foregoing Memorandum Opinion of this same date, it is hereby ORDERED, ADJUDGED and DECREED that judgment is entered for Defendants.

---

**6.** We note that many of the attorneys retained by Plaintiffs have never been paid and have themselves been forced to seek judgments against Plaintiffs herein.